# UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

THERESA GUTHRIE, )
)
)
      Plaintiff, )
)
v. ) No. 05-CV-68-SAJ
)
JO ANNE B. BARNHART, )
Commissioner of Social Security )
Administration, )
)
      Defendant. )

## OPINION AND ORDER[1/]

Pursuant to 42 U.S.C. § 405(g), Plaintiff appeals the decision of the Commissioner denying Social Security benefits.[2/] Plaintiff asserts that the Commissioner erred because (1) the ALJ erred in not finding that Plaintiff's mental impairment was severe at Step Two, (2) the ALJ erred by not including all of Plaintiff's physical limitations in Plaintiff's residual functional capacity; and (3) the ALJ erred by finding Plaintiff could return to her past relevant work as a cashier. For the reasons discussed below, the Court reverses and remands the Commissioner's decision for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born November 15, 1964. [R. at 57]. In her disability supplemental interview outline, Plaintiff wrote that she washed dishes, vacuumed, and tried to walk some,

---

    [1/]   This Order is entered in accordance with 28 U.S.C. § 636(c) and pursuant to the parties' Consent to Proceed Before United States Magistrate Judge.

    [2/]   Administrative Law Judge Lantz McClain (hereafter "ALJ") concluded that Plaintiff was not disabled by decision dated October 31, 2003. [R. at 27]. Plaintiff appealed the decision by the ALJ to the Appeals Council. The Appeals Council declined Plaintiff's request for review on November 30, 2004. [R. at 7].

but that she experienced pain. [R. at 78]. Plaintiff noted that sometimes her pain medication did not alleviate her pain. [R. at 78].

Plaintiff believes that she sleeps three to four hours each night and that her sleep is interrupted by pain. [R. at 78]. Plaintiff noted that her youngest son has ADHD and OPD. [R. at 78]. According to Plaintiff, she does not go anywhere because of the weight she has gained and because she hurts. [R. at 78]. Plaintiff prepares dinner about four or five nights each week. [R. at 79]. Plaintiff does clean her house but noted it takes about two hours for her to clean because she has to takes breaks to sit due to her pain. [R. at 80]. Plaintiff watches television or listens to the radio for about six hours each day. [R. at 81].

Plaintiff wrote that she was unable to sit for long periods of time because her hand shook a lot. [R. at 81]. Plaintiff is able to drive. [R. at 82]. Plaintiff noted that she takes MS Contin for the pain but that some days her pain is unaffected by the pain relief medicine. [R. at 85]. Plaintiff wrote that her depression had caused her to gain weight and she no longer wanted to be seen in public. [R. at 97].

Plaintiff completed a reconsideration of disability report on July 5, 2002. [R. at 98]. Plaintiff wrote that her back and neck pain limited her ability to stand or sit and that she was unable to lift. Plaintiff's right leg was sometimes numb and Plaintiff reported a bulging disc in her neck which was painful. Plaintiff wrote that she suffered from severe depression and was possibly bi-polar, and had attempted suicide previously. [R. at 98]. Plaintiff noted that she was too ashamed to discuss the issue, but that she had previously attempted to kill herself and had been hospitalized for three days due to her actions. [R. at 101]. Plaintiff

noted that she was five foot tall and currently weighed 230 pounds, with a normal weight of 190 pounds. [R. at 123].

X-rays dated February 12, 1999, indicated minor degenerative spurring at L4-5 with minor disc space narrowing. [R. at 180]. An MRI dated April 13, 1999, indicated a mild central nodular disc bulge at C6-7 level. [R. at 182].

Plaintiff was admitted August 28, 2000, on complaints of abdominal pain. Plaintiff had an ERCP procedure, and was released and asked to schedule an additional ERCP in one week. [R. at 185]. Plaintiff again complained of abdominal pain on November 16, 2000, and had an operation. [R. at 187].

Plaintiff was treated at Claremore Regional Hospital on March 29, 2001, where she was "grimacing in pain." [R. at 196]. On August 16, 2001, Plaintiff complained of lumbar pain radiating into both legs and the buttocks. [R. at 207]. Plaintiff reported a fall in 1997 with back surgery and an L5-S1 diskectomy, with the pain increasing in her legs and her back. [R. at 207]. The doctor concluded Plaintiff had significant lumbar pain at the L5 region and concluded an L5 laminectomy and microdiskectomy was necessary. [R. at 209].

Plaintiff was seen in the emergency room on September 4, 2001, with chief complaints of suicidal thoughts and depression. Plaintiff was brought to the emergency room by the police. [R. at 211]. Plaintiff complained of situational problems with her son and Plaintiff's wrists showed incision marks. [R. at 211]. Plaintiff was released on September 7, 2001. Plaintiff was noted as no longer being a danger to herself or others and wanting outpatient counseling. [R. at 218]. Plaintiff's GAF was listed as 30, 60. [R. at 219]. Plaintiff was noted as having a depressive disorder. [R. at 219]. Plaintiff had superficial cuts on her left wrist that were made with a key chain pocket knife. [R. at 223].

Plaintiff reportedly felt overwhelmed with her nine year old son who has severe mental health issues. [R. at 226].

Plaintiff was admitted September 17, 2001, for confusion and dysarthria. A CAT scan and MRI were done and both were negative. [R. at 234]. Plaintiff was discharged September 18, 2001, with no known etiology for her symptoms. [R. at 242]. Plaintiff evidently believed she had been hospitalized for a stroke. However, Plaintiff's doctor noted that there was no evidence of Plaintiff having had a stroke. [R. at 254]. Plaintiff's doctor concluded that Plaintiff needed some assistance for the psychiatric management of her nine-year old son. [R. at 254].

Reports from Bryan Touchet, M.D., dated March 12, 2002, indicate that Plaintiff "tried to cut [her] wrist." [R. at 388]. Plaintiff noted that she tried to cut her wrist due to anger in not getting help for her son who is nine years old and needs assistance. [R. at 388]. Plaintiff's son was in foster care after Plaintiff's actions. Plaintiff noted depressive symptoms for the prior six years after her father's death. Plaintiff's longest bout of depression lasted over two weeks. Plaintiff's sister was reportedly bipolar and Plaintiff's father tried to commit suicide. [R. at 388]. Plaintiff also reported severe back pain. [R. at 388]. The doctor noted "major depression, recurrent, moderate without psychotic features and anxiety disorder NOS." [R. at 389]. The doctor listed Plaintiff's functioning assessment at axis V as 52/60. [R. at 389]. In her client history, Plaintiff wrote that her son caused her great difficulty and she had been attempting to get him help for almost five years, but no one listened. Plaintiff wrote that she cut her wrists "just scratches" to get someone to listen to her. [R. at 392].

On April 23, 2001, Plaintiff had numerous complaints. Plaintiff was reported as sad, irritable, sleep disturbed, suicidal ideation, hopelessness, fatigue, depressed, worried, and indecisive. [R. at 271]. One note indicated that Plaintiff "lost part-time job delivering newspapers as her route uncovered when she was in ER with depression last week. Feels this is only type job she can do while caring for Austin." [R. at 272].

There are some indications that Plaintiff was in assisted learning programs in high school. In addition, at least one examiner noted that Plaintiff was retarded. [R. at 273].

A Physical Residual Functional Capacity Assessment was completed by Thurma Fiegel, M.D., on April 25, 2002. [R. at 321]. She concluded Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about six hours in an eight hour day, and sit about six hours in an eight hour day. [R. at 322].

A Residual Physical Functional Capacity Assessment completed February 6, 2003, indicated Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about six hours in an eight hour day, and sit about six hours in an eight hour day. [R. at 429]. The doctor noted that Plaintiff has had two back surgeries for disc disease and still complained of back pain which limited her activities. Plaintiff has an antalgic gait and pain in her hip but was otherwise able to walk normally. [R. at 429].

A psychological evaluation was completed by Minor W. Gordon, Ph.D., on May 24, 2002. [R. at 330]. Dr. Gordon noted that Plaintiff had an admission in September 2001 for treatment following a suicide attempt, and that Plaintiff was treated about two years previous to his examination for problems with depression. Currently, Plaintiff sees a doctor once each month and a therapist once every three weeks. [R. at 330]. Plaintiff noted that she primarily sits at home because she has no money to do anything. [R. at 330]. He

estimated her intelligence as average. [R. at 331]. Plaintiff was viewed as a mildly depressed female with depression stemming from chronic pain. Plaintiff's energy was low and Plaintiff was viewed as likely addicted to narcotic analgesics. [R. at 331].

A Psychiatric Review Technique form was completed by Burnard L. Pearce, Ph.D., on June 5, 2002. He noted that Plaintiff's affective disorder was not severe. [R. at 333]. Plaintiff was noted as having mild restrictions of daily living, mild difficulties in maintaining social functioning, no difficulties in maintaining concentration, and no episodes of decompensation. [R. at 349]. A second form completed by Margaret McKinney, Ph.D., February 6, 2003, noted Plaintiff's impairment as "not severe." Plaintiff was noted as having mild restrictions of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, and no episodes of decompensation. [R. at 445].

X-rays dated December 5, 2003, indicated a mass effect on the thecal sac in the central and left paracentral location at the L5-S1 secondary to recurrent disc. Post-surgical changes within the lamina of the L5 and S1 level were noted. [R. at 464]. A myelogram and CT scan dated December 5, 2003 was interpreted as indicating joint space narrowing at the L5-S1 level with endplate sclerosis. [R. at 465].

Plaintiff testified before the ALJ on October 8, 2003. [R. at 466]. Plaintiff stated that she had her first surgery on December 4, 1997, and was in constant pain following the surgery. [R. at 473]. Plaintiff was 38 years old at the time of the hearing before the ALJ and testified that she graduated from high school and received one year of vo-tech training in business and office. [R. at 473].

Plaintiff is 5'1" tall and weighs 220. [R. at 474]. Plaintiff stated that her weight has remained stable over the prior six months. [R. at 474].

Plaintiff has had two surgeries on her low back. [R. at 474]. Plaintiff noted that she experiences pain in her low back, into her hips, and down her left and right leg. Plaintiff noted that her left leg bothers her all of the time. [R. at 474]. Plaintiff stated that she has a bulging disc at C5-C6. [R. at 474]. Plaintiff noted that in July she took an overdose of one of her medications and was placed into the hospital. [R. at 475].

Plaintiff also stated that she experiences numbness and tingling in her hands. Plaintiff stated that she knew that she had carpal tunnel syndrome, but that she was unable to do anything about it due to lack of insurance.

Plaintiff also suffers from depression. [R. at 475]. Plaintiff noted that she tried to commit suicide on two occasions – first by scratching her wrists with a knife and second by an overdose. [R. at 476].

Plaintiff lives in a trailer house with her two children, aged 17 and 11. [R. at 476]. Plaintiff also stated that her 11 year old was in the custody of DHS so he could receive medical treatment and her 17 year old lived with his father. [R. at 476]. Plaintiff noted that she had no electricity, currently lived with her mother, and that her trailer was being repossessed. [R. at 477]. During the day, Plaintiff generally watches television and occasionally works on crossword puzzles. [R. at 479].

## II. SOCIAL SECURITY LAW AND STANDARD OF REVIEW

The Commissioner has established a five-step process for the evaluation of social security claims. *See* 20 C.F.R. § 404.1520. Disability under the Social Security Act is defined as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment
> . . . .

42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act only if his

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy. . . .

42 U.S.C. § 423(d)(2)(A).[3/]

The Commissioner's disability determinations are reviewed to determine (1) if the correct legal principles have been followed, and (2) if the decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

The Court, in determining whether the decision of the Commissioner is supported by substantial evidence, does not examine the issues *de novo*. *Sisco v. United States Dept. of Health and Human Services*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner. *Qualls v. Apfel*, 206 F.3d 1368 (10th Cir. 2000); *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). The Court will, however, meticulously examine the entire record to determine if the

---

[3/] Step One requires the claimant to establish that he is not engaged in substantial gainful activity (as defined at 20 C.F.R. §§ 404.1510 and 404.1572). Step Two requires that the claimant demonstrate that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 1521. If claimant is engaged in substantial gainful activity (Step One) or if claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, claimant's impairment is compared with those impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). If a claimant's impairment is equal or medically equivalent to an impairment in the Listings, claimant is presumed disabled. If a Listing is not met, the evaluation proceeds to Step Four, where the claimant must establish that his impairment or the combination of impairments prevents him from performing his past relevant work. A claimant is not disabled if the claimant can perform his past work. If a claimant is unable to perform his previous work, the Commissioner has the burden of proof (Step Five) to establish that the claimant, in light of his age, education, and work history, has the residual functional capacity ("RFC") to perform an alternative work activity in the national economy. If a claimant has the RFC to perform an alternate work activity, disability benefits are denied. *See* Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

Commissioner's determination is rational.  *Williams*, 844 F.2d at 750; *Holloway v. Heckler*, 607 F. Supp. 71, 72 (D. Kan. 1985).

"The finding of the Secretary[4/] as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is that amount and type of evidence that a reasonable mind will accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Williams*, 844 F.2d at 750.  In terms of traditional burdens of proof, substantial evidence is more than a scintilla, but less than a preponderance.  *Perales*, 402 U.S. at 401.  Evidence is not substantial if it is overwhelmed by other evidence in the record.  *Williams*, 844 F.2d at 750.

This Court must also determine whether the Commissioner applied the correct legal standards.  *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The Commissioner's decision will be reversed when he uses the wrong legal standard or fails to clearly demonstrate reliance on the correct legal standards.  *Glass*, 43 F.3d at 1395.

## III.  ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ found Plaintiff's impairments of post lumbar spine surgery and obesity would more than minimally interfere with her ability to perform work-related activities and found Plaintiff's impairments were therefore severe.  The ALJ concluded that Plaintiff's depression was a non-severe impairment and the ALJ did not further discuss limitations posed by Plaintiff's mental status.  [R. at 21].  The ALJ concluded that Plaintiff could lift ten pounds occasionally, five pounds frequently, stand or walk at least two hours in an eight

---

[4/] Effective March 31, 1995, the functions of the Secretary of Health and Human Services ("Secretary") in social security cases were transferred to the Commissioner of Social Security. P.L. No. 103-296. For the purpose of this Order, references in case law to "the Secretary" are interchangeable with "the Commissioner."

hour work day and sit six hours in an eight hour work day, with only occasional stooping. [R. at 25]. The ALJ concluded, at Step Four, that Plaintiff could return to her past relevant work based on the testimony of a vocational expert. [R. at 25].

## IV.  REVIEW

**Step Two**

Plaintiff initially alleges that the ALJ erred by finding that Plaintiff's mental impairment was not severe at Step Two. Defendant asserts that the ALJ properly concluded that the Plaintiff's mental impairment was not severe. The Court concludes that the ALJ's treatment of Plaintiff's mental impairment at Step Two requires reversal, but not for the reason identified by Plaintiff.

The Step Two burden placed on Plaintiff is *de minimis*. *Williams*, 844 F.2d at 751. The Commissioner's own regulations state that

> [g]reat care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued.

Social Security Ruling 85-28 (1985). But, more importantly, Step Two "is an administrative convenience [used] to screen out claims that are 'totally groundless' solely from a medical standpoint." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (*per curiam*) (*quoting Farris v. Secretary of HHS*, 773 F.2d 85, 89 n. 1 (6th Cir. 1985)). In other words, if an ALJ decides that Plaintiff has <u>any</u> "severe" impairment, then the ALJ proceeds past Step Two in evaluating Plaintiff's ability to perform work. At the remaining steps of the sequential

evaluation, <u>all</u> of Plaintiff's asserted impairments, whether or not severe, should be considered.

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairment could be the basis of eligibility under the law, <u>we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity</u>.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 404.1523 (emphasis added).  *See also Railey v. Apfel*, 134 F.3d 383 (10th Cir. 1998); Soc. Sec. Rul. 96-8p (July 2, 1996) (ALJ must consider both severe and nonsevere impairments when assessing RFC).

In this case, the ALJ dismissed Plaintiff's mental impairment at Step Two.  The ALJ proceeded to consider Plaintiff's physical impairments and her ability to perform work, but never again addressed any possible, albeit mild limitations imposed by Plaintiff's alleged mental impairment.  The record contains at least two non-examining mental assessment forms indicating Plaintiff has mild restrictions of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration.  The ALJ should have assessed these limitations and determined whether or not these limitations impacted the identified job base.

**Step Four**

Plaintiff asserts, generally, that the ALJ erred in finding that Plaintiff could return to her past relevant work.  Plaintiff's primary focus is the ALJ's failure to include Plaintiff's asserted mental impairments in Plaintiff's residual functional capacity.

-- 11 --

The Court notes, in this case, the ALJ primarily relies upon the testimony of a vocational expert in finding that Plaintiff could perform her past relevant work. The Tenth Circuit Court of Appeals has specifically frowned upon the delegation of this duty to the vocational expert. In *Winfrey v. Chater*, 92 F.3d 1017, (10th Cir. 1996), the Circuit considered whether the requirements of Step Four may be fulfilled by posing questions to the vocational expert.

> Having failed to complete phase two appropriately, the ALJ was unable to make the necessary findings at phase three about plaintiff's ability to meet the mental demands of his past relevant work despite his mental impairments. The Secretary glosses over the absence of the required ALJ findings, by relying on the testimony of the VE [vocational expert] that plaintiff could meet the mental demands of his past relevant work, given the mental limitations found by the ALJ. <u>This practice of delegating to a VE many of the ALJ's fact finding responsibilities at step four appears to be of increasing prevalence and is to be discouraged</u>.
> 
> At step five of the sequential analysis, an ALJ may relate the claimant's impairments to a VE and then ask the VE whether, in his opinion, there are any jobs in the national economy that the claimant can perform. This approach, which requires the VE to make his own evaluation of the mental and physical demands of various jobs and of the claimant's ability to meet those demands despite the enumerated limitations, is acceptable at step five because the scope of potential jobs is so broad.
> 
> At step four, however, the scope of jobs is limited to those that qualify as the claimant's past relevant work. Therefore, it is feasible at this step for the ALJ to make specific findings about the mental and physical demands of the jobs at issue and to evaluate the claimant's ability to meet those demands. Requiring the ALJ to make specific findings on the record at each phase of the step four analysis provides for meaningful judicial review. <u>When, as here, the ALJ makes findings only about the claimant's limitations, and the remainder of the step four assessment takes place in the VE's head, we are left with nothing to review.</u>
> 
> We are not suggesting, as has the Fourth Circuit, *see Smith v. Bowen*, 837 F.2d 635, 637 (4th Cir.1987), that the ALJ

> may not rely on VE testimony in making the necessary findings at step four. As SSR 82-62, and SSR 82-61, Soc. Sec. Rep. Serv., Rulings 1975-1982, 836, indicate, a VE may supply information to the ALJ at step four about the demands of the claimant's past relevant work. *Id.* at 811-12, 838. For example, if the ALJ determines that the claimant's mental impairment affects his ability to concentrate, the ALJ may ask the VE for information about the level of concentration necessary to perform the claimant's past relevant work. The VE's role in supplying vocational information at step four is much more limited than his role at step five, where he is called upon to give his expert opinion about the claimant's ability to perform work in the national economy. Therefore, while the ALJ may rely on information supplied by the VE at step four, the ALJ himself must make the required findings on the record, including his own evaluation of the claimant's ability to perform his past relevant work.

*Id.* at (emphasis added).

An evaluation at Step Four requires the ALJ to make certain findings. The ALJ's findings must contain:

1. A finding of fact as to the individual's RFC.
2. A finding of fact as to the physical and mental demands of the past job/occupation.
3. A finding of fact that the individual's RFC would permit a return to his or her past job or occupation.

Soc. Sec. Rep. Serv., Rulings 1975-1982, SSR 82-62; Washington v. Shalala, 37 F.3d 1437, 1442 (10th Cir. 1994); Henrie v. United States Dep't of Health & Human Services, 13 F.3d 359, 361 (10th Cir. 1993). In this case, the ALJ primarily relies upon the testimony of the vocational expert and a general analysis which states that a comparison of past relevant work and Plaintiff's job demands has been made. However, the ALJ's decision does not contain all of these detailed findings. On remand, if the ALJ concludes Plaintiff is not disabled at Step Four, the ALJ should detail his findings.

Further, the Court notes that on remand, the ALJ should insure that a hypothetical question that is posed to the vocational expert and relied upon by the ALJ should exactly match the findings the ALJ makes with regard to the claimant's RFC. In this case, the Plaintiff's RFC was listed as lifting or carrying ten pounds occasionally and up to five pounds frequently. [R. at 25]. The question posed to the vocational expert included lifting or carrying ten pounds occasionally and frequently lifting or carrying from five to ten pounds. [R. at 483-84].

Dated this 14th day of September 2006.

Sam A. Joyner
United States Magistrate Judge